**L.D. WILLIAMS, et al., Plaintiffs,**

v.

**TEXACO, INC., et al., Defendants.**

**Civ. No. 89–862 JB.**

United States District Court,
D. New Mexico.

March 29, 1994.

James C. Ritchie, Patricia M. Taylor, Mark A. Smith, Rodey, Dickason, Sloan, Akin & Robb, Albuquerque, NM, for plaintiffs.

Eric D. Lanphere, Hinkle, Cox, Eaton, Coffield & Hensley, Albuquerque, NM, Jesse R. Pierce, Clements, O'Neill & Pierce, Houston, TX, Joseph W. Morris, James M. Studivant, Gable & Gotwals, Inc., Tulsa, OK, Robert P. Thibault, Texaco, Inc., Denver, CO, for defendants.

## *MEMORANDUM OPINION AND ORDER*

BURCIAGA, Chief Judge.

THIS MATTER is before the Court on Defendant Texaco, Inc.'s December 23, 1993 motion for reconsideration of the Court's order of September 27, 1993, striking Texaco's discharge in bankruptcy defense and designating as an established fact that the Texaco–Valley Pipe Lines gas purchase contract has a market price redetermination clause, wherein the price of gas will be redetermined annually at the highest price paid in the Texas Railroad Commission District 8. The Court, having reviewed the pleadings, the submissions of the parties and the relevant law, and being otherwise fully advised in the premises, finds Defendant Texaco, Inc.'s motion is not well taken and is denied. The Court, however, will change the designated

fact sanction. In addition, Texaco, Inc. is entitled to a more elaborate explanation of, and justification for, the Court's imposition of sanctions.

Plaintiffs are the lessors of the M.L. Bailey Gas Unit Well No. 1–A ("Well") in Pecos County, Texas, and owners of royalty interests in the gas. Defendant Texaco, Inc. ("Texaco") operated the well as lessee. In February of 1970, Texaco entered into a 20–year contract with Intratex Gas Company ("Intratex") for the sale of gas at the wellhead at a fixed price. In their complaint, filed July 26, 1989, Plaintiffs allege, *inter alia,* that Texaco engaged in self-dealing with respect to the Intratex contract, failed to bargain for a commercially reasonable price, and consequently underpaid royalties to Plaintiffs.

In 1985, a Texas state district court awarded Pennzoil an $11 billion judgment against Texaco. Consequently, Texaco filed for Chapter 11 bankruptcy on April 12, 1987 in the Southern District of New York. On March 23, 1988, Texaco's bankruptcy plan was confirmed. Shortly before filing the Chapter 11 petition, Texaco allegedly recorded an assignment of the gas lease at issue to Texaco Producing, Inc., a subsidiary of Texaco, Inc. Plaintiffs contend Texaco's assignment constituted a fraudulent conveyance.

This case has been in the discovery phase for nearly four years. On September 27, 1993, the Court imposed sanctions against Texaco for willful refusal to obey a discovery order and for other intentional acts of bad faith. The sanctions arose from Plaintiffs' March 18, 1993 motion for sanctions for Texaco's failure to cooperate in discovery, and Plaintiffs' July 23, 1993 motion for sanctions related to Texaco's belated filing of an action in New York bankruptcy court (attached to Plaintiffs' July 23, 1993 motion for a temporary restraining order and preliminary injunction). The September 27, 1993 order imposed costs and attorney's fees, struck Texaco's affirmative defense of discharge in bankruptcy, and, as an alternative to holding Texaco in default as to Plaintiffs' entire complaint, deemed as an established fact that the Texaco–Valley Pipe Lines contract Texaco failed to produce in discovery contained a price redetermination clause wherein the price of gas would be redetermined annually at the highest price paid in the Texas Railroad Commission District 8.

Texaco now moves this Court to reconsider these sanctions. Texaco is explicitly not contesting that portion of the Court's order imposing monetary sanctions. Texaco's motion for reconsideration, filed more than ten days after the September 27, 1993 order, will be treated as a motion for relief from judgment or order pursuant to Fed.R.Civ.P. 60(b)(1). "The Federal Rules do not recognize a 'motion for reconsideration' *in haec verba.* . . . [A] motion so denominated, provided that it challenges the prior judgment on the merits, will be treated as either a motion 'to alter or amend' under Rule 59(e) or a motion for 'relief from judgment' under rule 60(b)," depending on when the motion was filed. *Lavespere v. Niagara Machine & Tool Works, Inc.,* 910 F.2d 167, 173 (5th Cir.1990), *cert. denied,* —— U.S. ——, 114 S.Ct. 171, 126 L.Ed.2d 131 (1993). *See also Venable v. Haislip,* 721 F.2d 297, 299 (10th Cir.1983) ("Regardless of how it is styled, a post-judgment motion filed within ten days of entry of judgment . . . is properly construed as a Rule 59(e) motion."). A motion for relief from judicial errors under Rule 60(b)(1) is permissible if the motion is made within a reasonable time, as here. *See Security Mutual Cas. Co. v. Century Cas. Co.,* 621 F.2d 1062, 1067 (10th Cir.1980) (judicial error correctable under Rule 60(b)(1) if motion filed within reasonable time).

Due to the severity of the sanctions, the Court will specifically set forth in detail the totality of Texaco's conduct resulting in the imposition of sanctions. Since the inception of these proceedings, Plaintiffs have been forced to confront Texaco's pertinacious refusal to reasonably cooperate in discovery. Magistrate Judge Deaton, in an April 10, 1992 order denying Texaco's motion for reconsideration of a discovery order, wrote, "Every opportunity has been given Texaco to proceed in a reasonable manner in discovery, and, until very recently, Texaco has chosen a variety of means to delay that discovery." Mem.Op. and Order at 4 (D.N.M. April 10, 1992). Judge Deaton noted that Texaco's

objections to discovery were not only without merit but were also "attempt[s] to mislead or confuse the Court...." *Id.* As a result, Judge Deaton imposed monetary sanctions upon Texaco in the amount of $22,635.50 in attorney's fees.

Once again, Texaco resisted discovery, and on October 6, 1992, Judge Deaton entered a discovery order compelling Texaco to produce various documents by October 26, 1992. Texaco had objected to discovery of documents related to its April 12, 1987 bankruptcy filing on the grounds that all debts against Texaco were discharged on March 23, 1988, when the bankruptcy court confirmed Texaco's bankruptcy plan, and that Plaintiffs' attempt to sue on such debts and obtain such information is in contempt of the bankruptcy court's confirmation order discharging all debts. Judge Deaton rightly rejected this contention. Whether Texaco's affirmative defense of discharge in bankruptcy bars Plaintiffs' claims is an issue requiring factual development. For example, if Plaintiffs had not received notice of the bankruptcy proceedings or the bar date for filing proof of creditors' claims, and if Texaco had actual knowledge of Plaintiffs' claims, then the March 23, 1988 discharge of debts would be no defense, as discussed *infra.* Texaco was attempting to prevent Plaintiffs from discovering facts which would rebut the discharge in bankruptcy defense by arguing, essentially, that the mere pleading of an affirmative defense renders documents relating to that defense undiscoverable. In addition, Judge Deaton rejected Texaco's bald assertions of attorney-client privilege and ordered Texaco to produce a list of those items sought to be protected by a privilege.

On October 19, 1992, Texaco filed a motion for reconsideration of the Magistrate Judge's October 6 order, or in the alternative, motion to stay the order, and also filed objections with this Court. Both the reconsideration and the objections motions were again predicated on Texaco's already rejected contention that the March 23, 1988 discharge in bankruptcy defense rendered documents relating to that defense undiscoverable. Texaco disobeyed the October 6 order and resisted discovery based on its pending objections, despite the fact that Texaco knew that pending objections do not eliminate or postpone a party's duty to comply with discovery orders. Plaintiffs filed a motion to compel on November 16, 1992, and Texaco did not bother to respond. On December 21, 1992, Judge Deaton denied Texaco's motion for reconsideration, or in the alternative, motion to stay. Yet Texaco still refused to turn over bankruptcy documents and a privilege list. Plaintiffs again made demand for production. In response, on January 7, 1993, Texaco filed yet another motion to stay with both this Court and the Magistrate, two weeks after Judge Deaton denied its motion for reconsideration and over three months after the October 6 order. Additionally, Texaco's January 7 motion to stay was untimely. Fed. R.Civ.P. 72(a) gives parties ten days to file objections to a magistrate's order. Thus, the January 7 motion, based on the same rejected argument, was obviously intended merely for purposes of delay.[1] On January 27, 1993, Judge Deaton expressly ordered Texaco to comply with the October 6 order, and on March 4, 1993, Judge Deaton denied Texaco's January 7, 1993 motion to stay. Yet Texaco continued to refuse to produce the requested documents. Moreover, and most importantly, Texaco refused to turn over even those documents which were unrelated to Texaco's objections until February 11, 1993.

An example of Texaco's bad faith can be found in its October 19, 1992 motion for reconsideration filed with Magistrate Judge Deaton, in which Texaco asked, in the alter-

---

1. The Court's September 27, 1993 imposition of sanctions was based in part on Texaco's January 7, 1993 motion to stay. In its motion for reconsideration memorandum, Texaco explains that its January 7, 1993 motion to stay was timely because it was filed after Judge Deaton's December 21, 1992 order denying Texaco's motion for reconsideration, and "sought a stay of the December 21, 1992 order in order to preserve the Objections pending before this Court." In other words, Texaco argues it intended the January 7 motion to stay the December 21 order, not the October 6 order. Texaco falsely characterizes the nature of its January 7 motion, which is captioned, "Defendant Texaco Inc.'s motion to stay memorandum opinion and order dated October 6, 1992."

native, for a stay: "In the alternative, Texaco requests that the Magistrate Judge stay the order *until Texaco files a motion for summary judgment with the district court. If the question of the bankruptcy defense is determined as a matter of law, there will be no reason for any discovery related to Texaco's bankruptcy.*" Defendant Texaco, Inc.'s Motion for Reconsideration at 3 (Filed Oct. 19, 1992) (emphasis added). However, by Memorandum Opinion and Order dated May 22, 1991, this Court denied Plaintiffs' partial motion for summary judgment on the bankruptcy defense, ruling that there was an outstanding genuine issue of material fact regarding that defense. Texaco knew, therefore, that the defense could not be determined as a matter of law. Additionally, Magistrate Judge Deaton did not rule on Texaco's October 19, 1992 motion for reconsideration until December 21, 1992. During the intervening ten weeks, Texaco failed to file the promised summary judgment motion, and instead simply refused to produce documents ordered to be turned over by Judge Deaton.

Another clear example of Texaco's egregious conduct is evidenced by its failure to produce a certain document crucial to Plaintiffs' cause of action, a contract executed between Texaco and Valley Pipe Lines, Inc. on February 24, 1969. In their complaint, Plaintiffs aver that in February of 1970, Texaco entered into a 20–year contract with Intratex for the sale of gas produced at the wellhead at a fixed price. Plaintiffs allege Intratex transferred the gas purchased from Texaco to Neches Butane, Inc., an affiliate of Texaco, who used the gas in plants in which Texaco had ownership interests. Essentially, Plaintiffs claim Texaco's scheme enabled it to pay royalties based on actual proceeds (which Plaintiffs claim were commercially unreasonable due to Texaco's alleged self-dealing), when it should have been paying royalties based on fair market value. The terms of the February 24, 1969 Texaco–Valley Pipe Lines contract were included in the Intratex agreement, which read:

Other terms included in gas purchase contracts in the Delaware Basin Area, and in that certain Gas Purchase Contract dated February 24, 1969 between Valley Pipe Lines, Inc. as Buyer and Texaco, Inc., as Seller, ... will be included in the Gas Purchase Contract to serve as the entire agreement of the parties.

Plaintiffs first requested this document in their May 22, 1992 request for production. Texaco responded, "[t]he requested document will be produced if it exists." Defendant Texaco Inc.'s Response to Plaintiffs' Fourth Request for Production of Documents, Ex. A, at 6 (attached to Plaintiffs' Memorandum Brief in Support of Plaintiffs' March 18, 1993 motion for sanctions).[2] The document was not forthcoming, so on July 20, 1992, Plaintiffs moved to compel production of that and other documents. In the October 6 order, Judge Deaton mandated the Texaco–Valley contract's production. By letter dated October 29, 1992, and after the October 26, 1992 deadline, Texaco told Plaintiffs, "Texaco Inc. has not located the requested *document. However, Intratex has produced a copy of the requested document in the Self* case subject to a protective order. Please contact Mr. Vote at Intratex to obtain permission to receive a copy." Letter from Texaco's counsel, Ex. F, at 1. The *Self* case referred to is a companion suit filed in Texas against both Intratex and Texaco, *Buford Self v. Texaco, Inc.*

On November 10, 1992, Plaintiffs received from plaintiffs' counsel in the *Self* case the protective order Texaco agreed to. The protective order provided a mechanism through which Texaco could have produced the contract at issue—it did not prohibit the contract's disclosure. Agreed Protective Order, Ex. G, at 4. On November 19, 1992, Texaco's counsel wrote to Plaintiffs and informed them that Texaco's earlier statement regarding the contract was incorrect. The contract had not been produced in the *Self* case after all. Letter from Texaco's counsel, Ex. I. The letter did not tell Plaintiffs if Texaco had it, or what efforts were being made to obtain it. In response to yet another demand for

**2.** All further references to exhibits will be to those attached to Plaintiffs' Memorandum Brief in Support of Plaintiffs' March 18, 1993 motion for sanctions.

the contract's production, Texaco, instead of communicating directly with Plaintiffs, filed with the Court a "Memorandum Regarding Status of Production of Documents" on February 16, 1993. With respect to the Texaco–Valley contract, Texaco, reversing itself once again, recited:

> Texaco Inc. has not located the requested document. Intratex Gas Company produced a copy of the requested document in another lawsuit, but that production was made subject to a protective order which prohibits Texaco from disclosing the document. Texaco Inc. has previously advised counsel for plaintiffs of this fact and advised them to contact counsel for Intratex to obtain permission to receive a copy.

*Id.* at 2–3. This statement, made in a signed pleading, was incorrect and false or misleading in three respects: first, the protective order did not prohibit the document's production. Second, Texaco stated that it had told Plaintiffs about the protective order, but neglected to inform the Court that afterwards Texaco retracted its report and told Plaintiffs that the contract had not been produced and therefore was not under a protective order after all. And third, it is Texaco, not Plaintiffs or Intratex, that has the burden of producing this document. Texaco cannot shift this burden upon Plaintiffs by directing them to inquire with Intratex, who is not even a direct party to the Texaco–Valley contract.

Throughout these proceedings, Texaco filed numerous baseless motions designed as a delaying tactic, was continuously dilatory, frequently gave incomplete and evasive disclosures, refused to acknowledge discovery deadlines or abide by agreed-upon discovery procedures, failed to identify which requests were being fulfilled when Texaco did respond, and continued to advance the rejected objection that the documents were not relevant (because of the bankruptcy defense) or were privileged—despite the fact that Texaco was only required to produce a list of documents for which it claimed attorney-client privilege. Texaco's persistent and unjustified refusal to comply with Magistrate Judge Deaton's October 6, 1993 discovery order led,

*inter alia,* to the Court's eventual imposition of sanctions.

The ultimate instance of Texaco's bad faith, however, involves Texaco's filing, in United States Bankruptcy Court in New York, a motion for reopening Texaco's Chapter 11 case, holding Plaintiffs in contempt of Texaco's confirmation order, and assessing sanctions in the amount of $5,000.00 for every day Plaintiffs continued to pursue their claims in this Court. Texaco filed this motion on July 20, 1993, four years after Plaintiffs filed their complaint, and after Plaintiffs' March motion for sanctions. Texaco justified its late filing of the bankruptcy motion on a bankruptcy court order entered in *Griffin v. Texaco, Inc.,* CV. No. 87–B–20142 (Bankr. S.D.N.Y. Filed June 7, 1992), in which Texaco requested the bankruptcy court to enforce an injunction against other plaintiffs filing similar preconfirmation claims against Texaco. Such request was granted on June 15, 1993. However, even assuming the *Griffin* case justified Texaco's conduct, differences between this case and *Griffin* rendered Texaco's reliance on *Griffin* misplaced.

A hearing on Texaco's motion was set in New York on July 30, 1993. In its New York motion, Texaco made the same assertion rejected by both this Court and Judge Deaton, that Plaintiffs' filing of a complaint in New Mexico district court alleging wrongful acts that took place prior to March 23, 1988, is barred by its discharge in bankruptcy defense and is in violation of the bankruptcy confirmation plan, as a matter of law. Essentially, Plaintiffs are not even entitled to discovery relating to this bankruptcy defense, Texaco again argued. Texaco's attempt to force Plaintiffs to relitigate the bankruptcy issues in New York, in a forum deemed more hospitable to Texaco, would have worked a severe hardship on Plaintiffs. For that reason, Plaintiffs moved to temporarily restrain Texaco from proceeding further in New York and for a preliminary injunction. On July 23, 1993, this Court granted Plaintiffs' temporary restraining order and ordered Texaco to vacate the July 30, 1993 hearing before the New York bankruptcy court. This Court set a hearing on the preliminary injunction for August 3, 1993.

On July 26, 1993, the bankruptcy court reset the July 30, 1993 bankruptcy motion hearing to take place on August 26, 1993. On July 28, 1993, Texaco moved this Court to reset the preliminary injunction hearing to after August 31, 1993, telling the Court that the July 30 bankruptcy hearing had been vacated—but without informing the Court that the hearing had actually been reset for August 26. Plaintiffs informed this Court of the true nature of events, and this Court denied vacating the August 3, 1993 preliminary injunction hearing. Following the Court's latter order denying Texaco's attempt to vacate the preliminary injunction hearing, Texaco inexplicably stipulated to the granting of Plaintiffs' preliminary injunction, and withdrew its bankruptcy motion in New York. An order to that effect was entered by this Court on August 3, 1993.

Texaco propounds four arguments in its motion for reconsideration. First, this Court lacks subject matter jurisdiction to strike, as a sanction, Texaco's affirmative defense of discharge in bankruptcy; second, Texaco should not be sanctioned for withholding documents when objections were pending; third, Texaco was not afforded due process with respect to these sanctions; and fourth, the sanctions are too severe and disproportionate because Texaco did not intentionally act in bad faith.

## I. WHETHER THIS COURT LACKS POWER TO STRIKE TEXACO'S AFFIRMATIVE DEFENSE OF DISCHARGE IN BANKRUPTCY

Fed.R.Civ.P. 37(b)(2) permits the Court to sanction a party for failure to obey an order to provide or permit discovery. One sanction expressly authorized under the rule is "an order refusing to allow the disobedient party to support or oppose designated claims or defenses . . . ." Fed.R.Civ.P. 37(b)(2)(B). This Court struck Texaco's affirmative defense of discharge in bankruptcy because it "failed purposefully and without reasonable excuse to comply with the October Order." Mem. Op. & Order at 9 (D.N.M. Sept. 27, 1993). Texaco now contends that striking this affirmative defense, or in other words, refusing to allow Texaco to support this de-fense, was outside the Court's jurisdiction and therefore void.

Texaco's argument proceeds as follows: pursuant to 11 U.S.C. § 1141(d)(1) (1988), confirmation of Texaco's Chapter 11 plan on March 23, 1988 discharged all debts then existing against Texaco, including any claims Plaintiffs had for underpayment of royalties. 11 U.S.C. § 524(a)(1) provides that a discharge in bankruptcy:

(1) voids any judgment at any time obtained, to the extent that such judgment is a determination of the personal liability of the debtor with respect to any debt discharged under section . . . 1141 . . . of this title, *whether or not discharge of such debt is waived;*

(2) operates as an injunction against the commencement or continuation of an action, the employment of process, or an act, to collect, recover or offset any such debt as a personal liability of the debtor, *whether or not discharge of such debt is waived. . . .*

(emphasis added).

Section 524, as amended in 1970, excepts discharge in bankruptcy from the rule that an affirmative defense is waived if not asserted. Congress was concerned with creditors harassing debtors after their debts had been discharged:

Prior to 1970, the effect of a discharge was to create an affirmative defense that the debtor could plead in any action brought on the discharged debt. A primary reason for the amendments was to effectuate the discharge and render needless its assertion as an affirmative defense in a subsequent state court action. In the usual case of discharge abuse or creditor harassment, suit would be brought in a local court after the granting of the discharge, and if the debtor failed to plead the discharge affirmatively, the defense was deemed waived and an enforceable judgment could then be taken against him. Too often, the defense was in fact waived either through inadvertence, failure to be served or lack of means to obtain counsel. In any event, the former debtor would find himself and his property subject to a judgment taken by default against him.

3 Collier on Bankruptcy ¶ 524.01[1] at 524–5 (Lawrence P. King, ed., 15th ed. 1987). *See also Braun v. Champion Credit Union (In re Braun),* 141 B.R. 133, 138 (Bankr.N.D.Ohio 1992) (argument that defense of discharge in bankruptcy is waived if not affirmatively pled is "an antiquated argument"), *aff'd in part and remanded in part on other grounds,* 152 B.R. 466 (N.D.Ohio 1993). Accordingly, any judgment entered against a debtor on a discharged claim is void and of absolutely no effect, even if the debtor failed to raise the discharge defense. Texaco contends that because section 524 enjoins all actions to recover preconfirmation claims and voids all postconfirmation judgments on those claims, and because the affirmative defense of discharge in bankruptcy cannot be waived by failure to raise it or by failure to appear, the defense is identical to a defense of lack of subject matter jurisdiction, and therefore represents an inherent structural limitation on the Court's power. This Court, Texaco asserts, lacks the inherent power to "revive a debt discharged in bankruptcy," just as the Court lacks power to decide cases which do not come within its subject matter jurisdiction.

■ Texaco is correct in contending that a discovery sanction under Rule 37(b)(2)(B) cannot be used to confer subject matter jurisdiction that a court might not otherwise possess. "When the court lacks jurisdiction over the subject matter of the action, … it cannot employ Rule 37(b)(2)(B) to preclude proof of facts demonstrating want of jurisdiction." 4A James W. Moore et al., Moore's Federal Practice ¶ 37.03[2] at 37–80 (1988). In *Insurance Corp. of Ireland, Ltd. v. Compagnie des Bauxites de Guinee,* 456 U.S. 694, 102 S.Ct. 2099, 72 L.Ed.2d 492 (1982), the Supreme Court addressed the issue of whether a district court could, as a sanction for failure to comply with a discovery order directed at establishing personal jurisdiction, designate as an established fact that personal jurisdiction over the offending party exists, pursuant to Fed.R.Civ.P. 37(b). The Court resolved the issue in the affirmative. This case is instructive on the issue at bar.

In *Insurance Corp. of Ireland,* the defendants refused to comply with a discovery order directed at facts which would reveal whether the defendants were subject to the personal jurisdiction of the district court. *Id.* at 699, 102 S.Ct. at 2102. As a sanction, the district court essentially struck defendants' affirmative defense of lack of personal jurisdiction. *Id.* In analyzing the issue, the Supreme Court distinguished between subject matter and personal jurisdiction. Both concepts "serve different purposes, and these different purposes affect the legal character of the two requirements." *Id.* at 701, 102 S.Ct. at 2103. Subject matter jurisdiction is a requirement of Article III of the United States Constitution and acts of Congress, and defines the power of federal courts to hear cases or controversies. Its definition marks the outer boundaries of federal judicial power. *Id.* at 701–02, 102 S.Ct. at 2103–04. If a matter comes before a federal district court that is outside its subject matter jurisdiction, the court lacks the inherent power to decide the matter—even if both parties desire to have their case heard in federal court. "[N]o action of the parties can confer subject-matter jurisdiction upon a federal court. Thus, the consent of the parties is irrelevant, principles of estoppel do not apply, and a party does not waive the requirement by failing to challenge jurisdiction early in the proceedings." *Id.* at 702, 102 S.Ct. at 2104 (citations omitted).

However, "none of this is true with respect to personal jurisdiction." *Id.* The requirement of personal jurisdiction serves to protect an individual's rights to due process and "traditional notions of fair play and substantial justice." *International Shoe Co. v. Washington,* 326 U.S. 310, 316, 66 S.Ct. 154, 158, 90 L.Ed. 95 (1945); *Insurance Corp. of Ireland,* 456 U.S. at 702–03, 102 S.Ct. at 2104. The requirement of personal jurisdiction "recognizes and protects an individual liberty interest. It represents a restriction on judicial power not as a matter of sovereignty, but as a matter of individual liberty." *Insurance Corp. of Ireland* at 702, 102 S.Ct. at 2104. Like any other individual right, it can be waived, either intentionally, as when a party voluntarily submits to the jurisdiction of the court, *id.* at 703, 102 S.Ct. at 2104 (citation omitted), or inadvertently, as when a party fails to timely raise lack of personal jurisdiction as an affirmative defense, pursu-

ant to Fed.R.Civ.P. 12(h)(1). *Id.* at 704, 102 S.Ct. at 2105. A sanction "consisting of a finding of personal jurisdiction has precisely the same effect" as failure to enter a timely objection to personal jurisdiction. *Id.* at 705, 102 S.Ct. at 2105. Accordingly, a sanction designating the existence of personal jurisdiction "is nothing more than the invocation of a legal presumption, or what is the same thing, the finding of a constructive waiver." *Id.* at 706, 102 S.Ct. at 2106.

■ In terms of the analysis employed by the Court in *Insurance Corp. of Ireland,* Texaco's affirmative defense of discharge in bankruptcy is akin to the affirmative defense of lack of personal, not subject matter, jurisdiction. Congress enacted the Bankruptcy Code, and permitted debtors to assert the affirmative defense of discharge in bankruptcy, in order to afford debtors a fresh start, and relatedly, to prevent predatory creditors from circumventing dischargeability. *Kansas State Bank and Trust Co. v. Vickers (In re Vickers),* 577 F.2d 683, 686–87 (10th Cir. 1978); *Pacheco v. First Nat. Bank of Central Jersey (In re Pacheco),* 54 B.R. 639, 641 (Bankr.D.N.J.1985); H.Rep. No. 91–1502, 91st Cong., 2d Sess. 1–2 (1970) U.S.Code Cong. & Admin.News 1970, p. 4156 ("[T]he major purpose of [section 524] is to effectuate, more fully, the discharge in bankruptcy by rendering it less subject to abuse by harassing creditors."). The defense operates to protect a debtor's personal rights under the Code, just as the requirement of personal jurisdiction serves to vindicate individual due process rights. Congress did not intend the defense of discharge in bankruptcy to operate as an inherent and immutable limitation of federal judicial power, in the same sense that subject matter jurisdiction operates to confine the class of cases federal courts may hear. Instead, by prohibiting courts from entertaining a creditor's postconfirmation claim on a discharged debt, the discharge in bankruptcy defense serves to protect personal, not structural, interests. *See Commodity Futures Trading Comm'n v. Schor,* 478 U.S. 833, 848–51, 106 S.Ct. 3245, 3255–56, 92 L.Ed.2d 675 (1986) (Art. III's guarantee of an independent judiciary serves both "personal interests," in protecting litigants from legislative or executive pressure on judicial decisionmaking, and "structural interests," in preserving the judiciary's role as an independent element in a tripartite system of government—concerns which cannot be eliminated by consent of the parties). The defense of discharge in bankruptcy recognizes and protects the debtor's individual rights under the Code, and as such, "represents a restriction on judicial power not as a matter of sovereignty, but as a matter of individual liberty." *Insurance Corp. of Ireland,* 456 U.S. at 702, 102 S.Ct. at 2104.

Because subject matter jurisdiction is a structural requirement delimiting a federal court's power, its mandate cannot be waived by a defendant either inadvertently or intentionally. By contrast, a discharge in bankruptcy defense, while it cannot be inadvertently relinquished because of Congress' concern for fully effectuating a debtor's discharge in bankruptcy, can be intentionally waived. Nothing in the Bankruptcy Code prevents a debtor from voluntarily paying any debt discharged in bankruptcy. *See* 11 U.S.C. § 524(f) (1988) (provisions in section 524 requiring court approval of reaffirmation agreements do not prevent a debtor from voluntarily repaying any debt). Moreover, nothing in the Code prevents a debtor from voluntarily admitting that a particular creditor's claim has not been discharged in bankruptcy, perhaps because the creditor never received notice of the bankruptcy claim.

Texaco has admitted, as it must, that this Court "has jurisdiction and authority to decide Texaco's affirmative defense of discharge in bankruptcy and all matters related thereto...." Stipulated Order Granting Preliminary Injunction at 2 (D.N.M. August 3, 1993). *See also* 3 Collier on Bankruptcy, *supra,* ¶ 523.13 at 523–100 (district court has concurrent jurisdiction with bankruptcy court, citing cases). In the words of the Supreme Court in *Insurance Corp. of Ireland,* "By submitting to the jurisdiction of the court for the limited purpose of challenging [plaintiffs' ability to recover on preconfirmation claims], the defendant agrees to abide by that court's determination...." *Id.* at 706, 102 S.Ct. at 2106. Texaco's deliberate and unjustified failure to supply the requested information related to its bankruptcy de-

fense "was but an admission of the want of merit in the asserted defense." *Hammond Packing Co. v. Arkansas,* 212 U.S. 322, 351, 29 S.Ct. 370, 380, 53 L.Ed. 530 (1909) (rejecting due process challenge to court's rendering default judgment against defendant who failed to comply with discovery order). Therefore, the Court's sanction striking Texaco's discharge in bankruptcy defense was "nothing more than the invocation of a legal presumption, or what is the same thing, the finding of a constructive waiver." *Insurance Corp. of Ireland,* 456 U.S. at 706, 102 S.Ct. at 2106.

As support for its argument that this Court lacks power to strike Texaco's discharge in bankruptcy defense as a sanction for discovery abuse, Texaco overemphasizes congressional intent to prevent inadvertent waivers. Texaco's contention is a perversion of the purpose behind section 524's nonwaivability provisions. Congress was concerned that debtors may fail to raise the affirmative defense of discharge due to "misplaced reliance" on the bankruptcy discharge, "an inability to retain an attorney due to lack of funds, or because [the debtor] was not properly served." H.Rep. No. 91–1502, 91st Cong., 2d Sess. 1–2 (1970), U.S.Code Cong. & Admin.News 1970, p. 4156. The aim of nonwaivability is "to give greater effect to the discharge for those who need it most, that is, the ordinary wage earner," *id.,* and to prevent creditors from "unfairly harass[ing] a bankrupt, especially the 'little guy' who is the subject of the typical 'consumer' or nonbusiness bankruptcy...." 116 Cong.Rec. 9549 (1970) (remarks of Cong. Wiggins). The case at bar does not even remotely resemble the situation Congress envisioned. Section 524 was designed to protect the individual debtor, unfamiliar with the intricacies of the Bankruptcy Code or civil procedure, from mistakenly relinquishing his or her rights under the Code; it was not designed to shield well-represented multinational corporate defendants from sanctions imposed due to intentional noncompliance with discovery orders.

Texaco's contention, if adopted, would permit defendants asserting a discharge in bankruptcy defense to disobey, with impunity, a court's discovery orders directed towards the revelation of facts which would assess the merits of that defense. Admittedly, the Court could impose monetary sanctions against the recalcitrant party, but such sanctions, as in this case, might not sufficiently deter abusive discovery tactics.

[T]he most severe in the spectrum of sanctions provided by statute or rule must be available to the district court in appropriate cases, not merely to penalize those whose conduct may be deemed to warrant such a sanction, but to deter those who might be tempted to such conduct in the absence of such a deterrent.

*National Hockey League v. Metropolitan Hockey Club, Inc.,* 427 U.S. 639, 643, 96 S.Ct. 2778, 2781, 49 L.Ed.2d 747 (1976) (per curiam) (affirming district court's Rule 37(b)(2)(C) dismissal of plaintiffs' complaint for failure to comply with a discovery order). Without the availability of this sanction, Texaco could continue to ignore this Court's orders, secure in the knowledge that its conduct, no matter how egregious, will not result in dismissal of its affirmative defense.

The Court's sanction striking Texaco's discharge in bankruptcy defense does not, contrary to Texaco's assertion, "revive discharged debts," as if the sanction somehow resurrected debts that have been forever eliminated. Texaco labors under a fundamental misunderstanding of the effect of a discharge of debts in bankruptcy. Sections 1141 and 524 do not extinguish the debt discharged, but instead merely prohibit enforcement of the debt. "The discharge is not a payment or extinguishment of the debt itself. It simply bars future legal proceedings to enforce the discharged debt against the Bankrupts." *In re Berry,* 85 B.R. 367, 369 (Bankr.W.D.Pa.1988) (citations omitted). *See also Horton v. Beaumont Place Homeowners Ass'n, Inc. (In re Horton),* 87 B.R. 650, 652 (Bankr.D.Colo.1987). The ultimate issue is not whether Plaintiffs' claims can be revived from dischargeability, but whether Plaintiffs' claims have in fact been discharged, and concomitantly, whether Plaintiffs are therefore barred from enforcing their claims. As Texaco has done throughout these proceedings, Texaco essentially ar-

gues that the mere pleading of an affirmative defense of discharge in bankruptcy, coupled with exhibits demonstrating the March 23, 1988 confirmation of its bankruptcy plan, conclusively ends the matter. Texaco refuses to acknowledge that outstanding issues of material fact exist as to whether Plaintiffs' claims have been discharged in bankruptcy.

One factual issue involves whether Texaco had actual knowledge of Plaintiffs' claims, such that its failure to give specific notice to Plaintiffs of the pending bankruptcy proceeding and bar date for proof of filing claims resulted in Plaintiffs' claims not being discharged. Section 1141 "does not discharge the debt of a creditor who was known to an individual corporate debtor and failed to receive notice...." *Spring Valley Farms, Inc. v. Crow (In re Spring Valley Farms),* 863 F.2d 832, 835 (11th Cir.1989). *See also Sheftelman v. Standard Metals Corp.,* 839 F.2d 1383, 1386 (10th Cir.1987) (notice of the bar date for filing proof of claims under Bankruptcy Rule 2002(a)(8) must be given "to satisfy due process requirements...."), *cert. dismissed,* 488 U.S. 881, 109 S.Ct. 201, 102 L.Ed.2d 171 (1988); *Reliable Elec. Co. v. Olson Constr. Co.,* 726 F.2d 620, 622–23 (10th Cir.1984) (failure to provide statutory notice of confirmation hearing violated creditor's due process rights). In all of the cases Texaco cites in support of its ostensibly irrefutable contention that "all claims based on Texaco's pre-confirmation conduct were discharged upon confirmation ...," Texaco Inc.'s January 31, 1994 Reply Brief in Support of Texaco Inc.'s Motion for Reconsideration, at 5–6, the creditors in those cases had received actual notice of Texaco's bankruptcy proceedings. *See Garrie v. James L. Gray, Inc.,* 912 F.2d 808, 811 (5th Cir.1990) (plaintiff had filed timely proof of claims but failed to assert an exemption from dischargeabili-

ty), *cert. denied,* 499 U.S. 907, 111 S.Ct. 1108, 113 L.Ed.2d 218 (1991); *Street v. Texaco, Inc.,* 1992 W.L. 345374 at *2 (E.D.La.1992) (plaintiffs filed an informal proof of claim, which court deemed insufficient to preserve that claim); *Gonzales v. Texaco, Inc.,* 1989 W.L. 152563 at *1 (E.D.La.1989) ("[P]laintiff testified that he personally received notice of the bar date for filing proof of claims.").

While it is undisputed that Texaco gave published notice, a fundamental tenet of due process mandates that notice by publication is inadequate if actual knowledge of claims exists. *New York v. N.Y., N.H., & Hartford R.R. Co.,* 344 U.S. 293, 296, 73 S.Ct. 299, 301, 97 L.Ed. 333 (1953). "[D]ue to necessity, publication notice satisfies due process requirements for *unknown* creditors.... On the other hand, the use of publication notice to notify *known* creditors fails to satisfy the dictates of the due process clause." *In re Schepps Food Stores,* 152 B.R. 136, 138 (Bankr.S.D.Tex.1993) (emphasis added) (citations omitted). Plaintiffs contend Texaco had actual knowledge of Plaintiffs' royalties claims. Plaintiffs may very well have been unknown creditors at the time Texaco filed its Chapter 11 petition, as Texaco strenuously argues. At this stage in the proceedings, however, Texaco's actual knowledge at the time of petition is not at issue. What concerns this Court is Texaco's refusal to allow Plaintiffs to discover facts which may (or may not) demonstrate that Texaco did indeed have actual knowledge of Plaintiffs' claims.[3]

Due to Texaco's discovery misconduct, Plaintiffs have been unable to discover whether their claims have in fact been discharged on March 23, 1988. The "nature of the information withheld by the defendant" supports the Court's actions. *Volkart Bros., Inc. v. M/V Palm Trader,* 130 F.R.D. 285,

---

**3.** Another factual issue related to Texaco's discharge in bankruptcy is whether Texaco committed fraud against Plaintiffs during the bankruptcy proceedings. In lieu of collaterally attacking the confirmation order, Plaintiffs seek damages for Texaco's alleged fraudulent conveyance. This cause of action has some support in the caselaw. *See F & M Marquette Nat. Bank v. Emmer Bros. Co. (In re Emmer Bros. Co.),* 52 B.R. 385, 390–92 (D.Minn.1985) (an independent cause of action sounding in fraud is not an attempt to revoke bankruptcy court's order confirming plan, and is

therefore not barred by the 180–day limitations period under 11 U.S.C. § 1144); *In re Newport Harbor Assoc.,* 589 F.2d 20, 24 (1st Cir.1978) (creditors allegedly injured by bankruptcy-related fraud are not "necessarily without other remedies ...," aside from 11 U.S.C. § 1144, if the fraud could not have been asserted in the bankruptcy proceedings, factual claims were not actually adjudicated, and the relief sought would not upset the confirmation plan). The information Plaintiffs seek to discover would relate to this cause of action.

289 (S.D.N.Y.1990). This Court deemed Texaco's failure to produce bankruptcy-related documents as a constructive admission of the lack of merit in the discharge in bankruptcy defense. This constructive admission does not "revive discharged debts," but instead deems Plaintiffs' claims as not having been discharged at all; therefore, Plaintiffs are not barred from enforcing their claims.

## II. WHETHER TEXACO SHOULD BE SANCTIONED FOR WITHHOLDING DOCUMENTS WHEN OBJECTIONS WERE PENDING

■ Texaco contends the October order should not have been fully binding on Texaco until this Court denied Texaco's objections. This contention avails Texaco very little with respect to the documents Texaco refused to disclose which were not subject to its pending objections. Texaco had absolutely no excuse for withholding those documents.

Fed.R.Civ.P. 72(a), governing a magistrate's determination of nondispositive pretrial matters such as discovery, provides that a party aggrieved by a magistrate's order has ten days to serve and file objections. The district judge shall then "consider such objections and shall modify or set aside any portion of the magistrate's order found to be clearly erroneous or contrary to law." *Id.* The rule is silent as to whether a party's duty to comply with the magistrate's order is automatically stayed pending final review by the district court of that party's objections. However, at least one court has opined, "[A]llowing the automatic stay of magistrate's orders would not only encourage the filing of frivolous appeals, but would grind the magistrate system to a halt." *Litton Indus., Inc. v. Lehman Bros. Kuhn Loeb, Inc.*, 124 F.R.D. 75, 79 (S.D.N.Y.), *appeal dismissed*, 125 F.R.D. 51 (S.D.N.Y.1989). Additionally, Judge Conway wrote, "Discovery matters have been delegated to the magistrate judges in order to promote judicial efficiency and the speedy resolution of pre-trial disputes.... Ill-considered 'strategic' objections to a magistrate judge's orders threaten to undermine these goals...." *National Excess Ins. Co. v. Civerolo, Hansen & Wolf, P.A.*, 139 F.R.D. 401, 404 (D.N.M.1991).

Many jurisdictions' local rules mandate that objections do not stay a party's duty to comply with the discovery order. The rationale for such rules is sound:

> Such an interpretation is more consistent with the Magistrate's Act's goals of facilitating the quick and final resolution of referred pretrial matters. If an objection operates as a stay of the order, not only is the losing litigant given an artificial incentive to object, but the magistrate's decision-making ability is eroded. It should be remembered that the magistrate is empowered to "determine" nondispositive pretrial matters. A magistrate's order will not determine anything if it can be automatically stayed by filing an objection. Indeed, such an interpretation would essentially reduce the magistrate's order to the status of a recommendation where an objection is raised.

7(Part 2) James W. Moore et al., Moore's Federal Practice ¶ 72.03[6.–12] at 72–53 to –54 (2d ed. 1991). This reasoning comports with the principle that a party is not entitled to disobey court orders even if later proven erroneous. *McDonald v. Head Crim. Ct. Sup. Officer*, 850 F.2d 121, 124 (2d Cir.1988).

Texaco acknowledges this contrary authority but insists that its objections deserved special treatment. Texaco quotes Moore's Federal Practice, in which the authors go on to note, "There may ... be circumstances in which the burden of compliance with the order would be so onerous that the district judge will be justified in concluding that the pendency of an objection excused compliance." 7(Part 2) Moore's Federal Practice, *supra*, ¶ 72.03[6.–12] at 72–54. Texaco's objections to the October order were predicated on relevancy and attorney-client privilege. Texaco contended that any bankruptcy-related documents were irrelevant because, in essence, Texaco would prevail on its discharge in bankruptcy defense. But the fact that Texaco was required to produce documents which might have been irrelevant does not render the burden of compliance so onerous that Texaco was justified in ignoring the order pending its relevancy objections. Assuming the documents were in fact irrele-

vant, Plaintiffs simply would have had access to documents inadmissible at trial.

With respect to those documents Texaco claimed were privileged, the October order did not require Texaco to produce any privileged documents. Texaco was only required to produce a privilege list, so that the Court could determine whether the privilege applied, instead of relying on Texaco's self-serving assertions of privilege. Certainly, the burden of producing privilege lists was not so onerous as to justify ignoring the October order pending objections. In summary, Texaco had no reasonable excuse to withhold the documents at issue.

### III. WHETHER TEXACO RECEIVED DUE PROCESS BEFORE THE COURT IMPOSED SANCTIONS

■ Texaco claims it was not afforded due process with respect to the sanctions, contending that it was never given notice and an opportunity to respond. Plaintiffs sought the sanction of dismissal of Texaco's affirmative defense only in their reply brief to their July 23, 1993 motion for sanctions, Texaco argues, and Texaco was not permitted to file a surreply; therefore, the Court was unable to consider Texaco's evidence of copies of pleadings from the *Griffin* case. Supposedly, this evidence would have demonstrated Texaco was justified in waiting until 1993 to file the New York bankruptcy motion.

Texaco's contention that it never received notice of the possibility of the sanctions being imposed until Plaintiffs' September 7, 1993 reply brief is false. Plaintiffs first moved for imposition of both the sanction striking Texaco's affirmative defense and the sanction of the designated fact in Plaintiffs' March 18, 1993 motion for sanctions. Texaco filed a response to the March 18 motion and had full opportunity to argue against imposition of both sanctions.

Additionally, Texaco did indeed file a surreply to Plaintiffs' September 7, 1993 reply brief, and therefore it was considered by the Court. In any event, nothing in Texaco's surreply was particularly enlightening. Texaco's surreply brief is devoted to attempting to point out the similarities between the *Griffin* case and this case. As discussed above,

Texaco attempted to justify its late filing of the New York bankruptcy motion on a bankruptcy court order entered in *Griffin v. Texaco, Inc.*, in which Texaco requested the bankruptcy court to enforce an injunction against plaintiffs filing similar prepetition claims against Texaco. Such request was granted on June 15, 1993. However, even if the two cases were similarly argued, Texaco has failed to explain why it waited four years to file the New York bankruptcy motion, after this Court and Plaintiffs had invested considerable resources in the present action. Had Texaco genuinely believed in the merits of its New York bankruptcy motion, it would have filed it years ago. Texaco's belated filing, after Plaintiffs' motion for sanctions, can only be interpreted as an abusive tactical maneuver.

Texaco also complains that it was denied the benefit of an evidentiary hearing. However, "[w]hether to hold a hearing before imposing sanctions is a matter of the sound discretion of the trial court." *Godlove v. Bamberger, Foreman, Oswald and Hahn*, 903 F.2d 1145, 1148–49 (7th Cir.1990) (not an abuse of discretion for lower court to deny hearing, when "[t]here was nothing left for the court to do at a formal hearing except waste more time of the court and [the parties].") *cert. denied*, 499 U.S. 913, 111 S.Ct. 1123, 113 L.Ed.2d 230 (1991).

In summary, Texaco was not denied due process. Texaco had more than adequate notice and opportunity to respond, and as discussed in the next section, the sanctions imposed were "just" and "related to the particular 'claim' which was at issue in the order to provide discovery." *Insurance Corp. of Ireland, Ltd. v. Compagnie des Bauxites de Guinee*, 456 U.S. 694, 707, 102 S.Ct. 2099, 2106, 72 L.Ed.2d 492 (1982).

### IV. WHETHER TEXACO'S CONDUCT WARRANTED THE SANCTIONS IMPOSED

In addition to striking Texaco's affirmative defense of discharge in bankruptcy, the Court designated as an established fact that the Texaco–Valley Pipe Lines gas purchase contract contained a market price redetermi-

nation clause, wherein the price of gas will be redetermined annually at the highest price paid in the Texas Railroad Commission District 8. Texaco contends its conduct did not warrant entering default judgment on Plaintiffs' underpayment of royalties claim. In their complaint, Plaintiffs allege Texaco, in negotiating the 1970 agreement with Intratex, failed to obtain an annual price redetermination clause that would permit the contract price to escalate with the market. Plaintiffs claim that had such a clause been included, royalty payments would have been higher. Now that the Court has established that such a clause was included in the Texaco–Valley Pipe Lines contract, this sanction is tantamount to default judgment against Texaco as to this particular claim, as Plaintiffs will now demand royalties based on the designated market price redetermination clause.

■ However, based on Texaco's conduct, this Court would have been justified in entering default judgment against Texaco on all of Plaintiffs' claims. Willfulness or bad faith may form the predicate for default judgment. *Societe Internationale v. Rogers,* 357 U.S. 197, 212, 78 S.Ct. 1087, 1095, 2 L.Ed.2d 1255 (1958). Additionally, the Tenth Circuit has provided five factors a district judge should consider in exercising discretion to enter a dismissal or default judgment. These factors are: (1) degree of actual prejudice caused by the misconduct; (2) the amount of interference with the judicial process; (3) the culpability of the litigant; (4) whether prior warning was given; and (5) the efficacy of lesser sanctions. *Ehrenhaus v. Reynolds,* 965 F.2d 916, 921 (10th Cir. 1992). "These factors do not constitute a rigid test; rather, they represent criteria for the district court to consider prior to imposing dismissal as a sanction." *Id.* Analysis of these factors supports the Court's imposition of sanctions.

■ With respect to the first factor, actual prejudice, Plaintiffs have been attempting to discover the same documents for nearly a year. This case has been in the discovery phase for nearly four years. Texaco's conduct during the entire course of discovery evinces an unmistakable effort to block all attempts to reach the merits of this case. Texaco has engaged in a deliberate campaign of delay and abuse. Valid attempts to discover documents in Texaco's possession became monumental efforts exacting inordinate time and cost. Texaco's belated attempt to relitigate issues in New York, if successful, would have also resulted in obvious prejudice to Plaintiffs. And finally, Texaco's inexcusable conduct with respect to the Texaco–Valley Pipe Lines contract, by leading Plaintiffs to a virtual dead end after considerable time and effort, has also been prejudicial to Plaintiffs.

To date, Texaco has yet to comply with the October 6 order mandating this document's production. Texaco now apparently claims it has lost it. Unfortunately, this document is critically important to Plaintiffs' case. In their complaint, Plaintiffs claim Texaco did not obtain the highest possible gas price in its contract with Intratex. The actual agreement between Texaco and Intratex and all of its terms is of obvious significance to Plaintiffs' cause of action. Plaintiffs contend Texaco's agreement to sell gas at a fixed price for such a long period of time, without any provision allowing for the price to increase with increasing market prices, breached its duties of good faith under the lease. In other words, had Texaco negotiated the Intratex agreement in good faith, Plaintiffs allege Texaco would have sought and obtained a market price redetermination clause. Under these circumstances, and based on the entirety of Texaco's conduct, the designated fact sanction was appropriate. The Tenth Circuit has confronted similar conduct involving a party's failure to produce critical documents in *Norman v. Young,* 422 F.2d 470 (10th Cir.1970). The court upheld the district court's sanction of default judgment.

Oral excuses were legion but never did defendants deny in writing (until after default) that the documents existed. Having failed to properly deny that which was presumed to exist, defendants failed to establish their inability to comply with the order. And, thereby, the Court could presume existence in a concealed state and/or that the evidence they would provide

would show the untruth or unmeritorious nature of the defense.

*Id.* at 473.

The second factor concerns the amount of interference with the judicial process. Texaco willfully refused to obey a discovery order of the Court. As Judge Sparr noted in the *Ehrenhaus* case, "If this [party] could ignore court orders here without suffering the consequences, the Court cannot administer orderly justice, and the result would be chaos." *Ehrenhaus,* 965 F.2d at 921. The ability of the Court to sanction parties for willful failure to obey discovery orders is an integral component of pretrial discovery. "Without adequate sanctions the procedure for discovery would be ineffectual." 8 Charles A. Wright et al., Federal Practice and Procedure § 2281 at 355 (Supp.1993).

> It is intended that [discovery] proceed at the initiative of the parties, free from the time-consuming and costly process of court intervention. When a party seeks to frustrate this design by disobeying discovery orders, thereby preventing disclosure of facts essential to an adjudication on the merits, severe sanctions are appropriate.

*Daval Steel Products v. M/V Fakredine,* 951 F.2d 1357, 1365 (2d Cir.1991) (citations omitted). *See also Ohio v. Arthur Andersen & Co.,* 570 F.2d 1370, 1376 (10th Cir.) ("Enforcement of the rules requires sanctions for disobedience of valid court orders."), *cert. denied,* 439 U.S. 833, 99 S.Ct. 114, 58 L.Ed.2d 129 (1978). Moreover, by filing its New York bankruptcy motion after four years of protracted discovery litigation, Texaco attempted to circumvent this Court's authority and shop for a forum deemed more favorable to its position.

The third factor, Texaco's culpability, is also satisfied. Texaco's failure to obey the October order was unjustified and intentional. Texaco has known throughout these proceedings that objections do not stay a party's duty to comply with discovery orders, and that production would not have been so onerous as to justify withholding the documents at issue, particularly with respect to the privilege list. In any event, Texaco refused to produce even those documents not subject to its objections. Texaco's New York bankrupt-cy motion is also telling evidence of its bad faith. Texaco's reliance on the *Griffin* case, in addition to being misplaced, is merely a post-hoc transparent pretext. Texaco's January 7, 1992 motion to stay, filed two weeks after Judge Deaton denied its motion for reconsideration and over three months after the October 6 order, was yet another delaying tactic. Finally, and perhaps most troubling, Texaco has, at best, not acted with complete candor towards the Court. Evidence of Texaco's disingenuousness consists of: (1) its arguments before Magistrate Judge Deaton, described by the judge as "attempt[s] to mislead or confuse the court...." Mem.Op. and Order at 4 (D.N.M. April 10, 1992); (2) Texaco's false characterization of the nature of its January 7 motion to stay, *see supra* note 1; (3) its October 19, 1992 motion for reconsideration filed with Judge Deaton; (4) Texaco's false or misleading misrepresentations to the Court in its February 16, 1993 "Memorandum Regarding Status of Production of Documents"; and (5) Texaco's July 28, 1993 motion to vacate the August 3, 1993 preliminary injunction hearing.

The fourth factor involves whether previous warnings were given. Although the Court did not specifically warn Texaco that willful failure to obey the October 6 order would result in imposition of the sanctions at issue, Texaco was on adequate notice as to this possibility by virtue of Plaintiffs' March 18, 1993 motion for sanctions, as discussed. Moreover, Texaco had already been sanctioned by Judge Deaton for discovery abuse on April 10, 1992. In any event, Texaco has been represented by legal counsel throughout these proceedings. Texaco's counsel is, or should be, well-versed in rules of discovery and the consequences of failure to follow discovery orders. Nothing in *Ehrenhaus* suggests that this Court was absolutely obligated to first warn Texaco that willful failure to obey Court orders might result in harsh sanctions. "A district court is not required to fire a warning shot...." *Hal Commodity Cycles Management Co. v. Kirsh,* 825 F.2d 1136, 1139 (7th Cir.1987). "We decline to hobble the necessary discretion of district courts to control discovery by imposing a

further requirement of formal and specific warnings before imposing Rule 37(b)(2) sanctions.... Parties and counsel have no absolute entitlement to be 'warned' that they disobey court orders at their peril." *Daval Steel Products v. M/V Fakredine,* 951 F.2d 1357, 1366 (2d Cir.1991).

The fifth and final factor concerns the efficacy of lesser sanctions. Monetary sanctions, in the amount of approximately $22,-000, have already been imposed against Texaco by Judge Deaton. As Judge Deaton held, "Every opportunity has been given Texaco to proceed in a reasonable manner in discovery, and ... Texaco has chosen a variety of means to delay that discovery." Mem. Op. and Order at 4 (D.N.M. April 10, 1992). These monetary sanctions obviously failed as a deterrent measure, and therefore the Court was quite justified in imposing more severe sanctions.

Hence, entry of default judgment against Texaco with respect to the entire complaint would have been warranted; as such, entering default judgment as to Plaintiffs' underpayment of royalties claim was well within the Court's discretion. The Court, however, believes the designated fact sanction should be modified. As imposed, the sanction dictates that Plaintiffs' damages—i.e., underpaid royalty payments—will be based on the difference between the price Texaco actually received for the gas it sold and the highest price obtainable in District 8. Yet in their complaint, Plaintiffs only seek damages based on the difference between the price Texaco received and fair market value. Moreover, Texaco claims that no contract it ever executed at that time contained a highest price redetermination clause, and in any event Intratex would never have agreed to such a clause. It appears that the designated fact sanction enables Plaintiffs to recover more than they might have been entitled had Plaintiffs prevailed on the merits. Plaintiffs should not receive a windfall from Texaco's conduct. The Court therefore will modify the designated fact to read as follows: the Texaco–Valley Pipe Lines gas purchase contract has a market price redetermination clause, wherein the price of gas will be redetermined annually *at average fair market value* in the Texas Railroad Commission District 8.

Wherefore,

**IT IS ORDERED, ADJUDGED AND DECREED** that Defendant Texaco, Inc.'s motion for reconsideration be, and hereby is, denied.

**IT IS FURTHER ORDERED** that the September 27, 1993 designated fact sanction be, and hereby is, modified to read as follows: the Texaco–Valley Pipe Lines gas purchase contract has a market price redetermination clause, wherein the price of gas will be redetermined annually at average fair market value in the Texas Railroad Commission District 8.